You all are the cross-appellees, but you're going to go first. Is that the deal? No, we're the cross-appellees. My name is Tecla Hanson-Young. I represent the federal defendants in the case. And I think we are cross-appellants. I think we may be labeled incorrectly as cross-appellees. Okay, we've got some varieties. Oh, no, we're cross-appellees. We're appellants slash cross-appellees. Okay, I don't care who goes first. If you want to go first, you can go first. It's not a problem. Our side appealed first. Okay. And you are Ms. Hanson-Young, is that correct? Yes. Very well. Please proceed. May it please the Court, my name is Tecla Hanson-Young, and I represent the National Marine Fisheries Service. I plan to share six minutes with Laura Wolf, who represents the State of Alaska, and two minutes with Douglas Stetting, who represents the Alaska Trawlers Association. I plan to reserve four minutes for rebuttal. Okay, so who's reserving the four minutes? You are? Me. Okay, very well. Thank you. The District Court committed reversible error here when it applied a presumption of vacator and separately assumed that vacator was warranted simply because the ESA and NEPA were violated. These errors contributed to the District Court's failure to carefully consider the individual equities, unduly discount the disruptive consequences of vacator of the incidental take statement that enabled Alaska fisheries to continue troll fishing, and the District Court also overvalued the limited benefits of vacator of the incidental take statement to southern resident killer whales. Conversely, the District Court correctly found that leaving the prey increase program in place was warranted where the prey increase program was already providing benefits to killer whales and where there were steps that could be taken and where the agency was in fact taking those steps to mitigate impacts to threatened populations of listed salmon. On the first issue that we raised on appeal, that the District Court erred in presuming vacator of the incidental take statement was appropriate. Vacator is an equitable remedy. As an equitable remedy, it is subject to ordinary equitable principles. So, counsel, I have two questions on that. You agree that our cases use the word presumptive, right? I would say some of them use the word presumptive. And the government has argued, and obviously we're a three-judge panel, but the government has argued that's inconsistent with the statute, right? That that's inconsistent with the law. That's correct. All right. So I have another statutory construction question for you. So looking at Section 706.2, that it says that the reviewing court shall hold unlawful and set aside agency actions found to be arbitrary and capricious. And the Supreme Court has instructed us, including recently, that shall mean shall. And so, again, that's not our precedent. So my question is, does the government think our precedent is wrong in a different way? I.e., it's wrong because the plain language of 706 says, if you find it arbitrary and capricious, you shall hold it unlawful and set aside. Isn't that plain language very clear as to what we're required to do absent a statutory change by the Congress? Well, I have two responses to that. First of all, the government's position is that set aside doesn't mean vacate. So the court could take that path and understand set aside to mean shall put it to the side while reviewing the agency action. In other words, not vacate. But even if the court doesn't go there, and it doesn't have to go there to find in the government's favor here, this court has in the Lam case, which we cite in our briefs, acknowledged that shall doesn't always mean – shall is not always mandatory. And there are numerous cases that have interpreted the shall set aside as not being mandatory. There are some cases in the D.C. Circuit that have interpreted shall in a mandatory way. But the vast majority of cases understand that shall in 706 does not mean that a court must set aside unlawful agency action. I would just ask this question. As you know, the Chief Justice in a recent case dealing with APA and what is to be done when the court finds that it is improperly applied, said, and I quote, that the D.C. Circuit had vacated cases in quotes five times before breakfast. Basically that, from his perspective, I think Justice Kavanaugh said the same thing. That's their remedy. It seems to me you can fall back on the allied signal exceptions, and I think that's what you're asking us to do here. But do we agree that at least under the APA, vacater is the remedy if the regulation is incorrect? Well, three other justices have acknowledged that they are open to hearing from different courts of appeals whether set aside does not mean vacate. So, yes, this is an open question now, and no court, to my knowledge, has really looked at this from first principles. Ms. Hanson-Young, I guess short of us getting eight of our friends to show up here, maybe we should focus then on the allied signal piece of it. I guess an overarching question, since it is an equitable discussion, is what are we to do about the two twists since the remedial decision? One is that our court has now stayed the vacater of the incidental take statement, and two, the government, the service has represented that within four months' time, all of this may be moot because we'll have a new biological opinion that it represents or at least restart any controversy, if not cure the issue. How do those enter into our equitable considerations of what we do going forward, given the status quo is now so different and will change again in four months? I think they are relevant, and I'm glad you brought that up. The agency is still on track to completing the remand by November 2024, so the remand period was going to be short when the remedy was decided, and it is even shorter now. It's just a matter of months. At this point, the case isn't moot because we still have the, with the absence of the stay order, we would still have the district court's remedy order in place. So up until the agency issues a new biological opinion, new environmental impact statement covering the challenged actions, this court should decide this case. Isn't that almost quixotic? I mean, I don't know how long it would take to get an opinion out, but say it's two or three months or something like that. You're just an eyelash away from a new report that moots the whole thing. So what's the point of our deciding this matter in this short interim period? Well, if you're suggesting that the court simply wait until the end of November. No, I'm just talking about a practical solution. As a practical matter, if the decision doesn't come out until after December 1st, that result would be fine with the federal defendants. We are not asking for a decision to be issued before December 1st of this year. We would essentially obtain the relief that we had sought, which is the stay of the remedy order. But could we decide it, assuming that you're on track with the November decision? Yes. How would we have a controversy to decide at that point? It would be moot. And we would likely, if things proceed the way that we expect them to proceed, of course I can't say for certain because it would be pre-decisional, but if things proceed on track, we would likely file a motion to dismiss our appeal and the cross-appeal as moot. And then the court would have to decide that issue. Now, I do still think there is some value to the court addressing these issues because it's likely that on when NIMS issues its new agency documents, it's likely that the conservancy will find fault with them. It generally does. And so we'll bring a similar lawsuit, and the same equities will arise. So let me ask you something about that. So I hope I have the numbers right here, and I apologize if I don't. Is the last declaration from Dr. Lacy the Lacy 3 declaration? Do I have that right? I believe that's correct.  So I'm looking at the Lacy 3 declaration. In the 12 months since the Lacy 2 declaration, there have been three deaths and no live births. The last live birth occurred in 2021. We would need to increase the Chinook prey availability by about 5% to stop the decline and that the path that the orcas are on now is certain extinction. Now, this is according to Dr. Lacy, assuming I have quoted his declaration correctly. Why is that not enough for us to uphold the district court's order that was stayed here by the motions panel? I would like to answer a question. I see I am eating into your time. Why don't you answer my colleague's question, and we'll give you a little extra time. But try to answer it quickly. Sure, absolutely. So the Lacy declaration is just wrong. The bar declaration that we submitted, I direct the court to the bar declaration. I've read it. Okay, which addressed the Lacy declaration. Lacy believed that fisheries in Alaska reduced prey by roughly 5% and assumed that there would be an equal amount of benefits to southern resident killer whales. That's an incorrect assumption to make. NIMS's calculations and the biological opinion took into account spatial and temporal information about where fish are and where killer whales are and determined that operation of the fisheries will only reduce prey in coastal waters in winter where resident whales are by half a percent on average, and in inland waters in the summer where whales are by 1.8%, and determined that in conjunction with the operation of the prey increase program that had been operating, allowing the fisheries to proceed on remand would not impact the whales. And the other problem with the Lacy declaration is that it didn't include two recent births from the killer whale population. And there's also inaccurate assumptions that Lacy has used, which is that there's a direct correlation or a precisely quantifiable correlation between prey abundance and killer whales when there are many other limiting factors on the killer whale population that the agency is trying to address. So the district court didn't weigh any of those individual facts, didn't grapple with those issues, didn't make any factual findings, and simply said, well, I don't really know how much fish are going to increase for killer whales, but I think it's meaningful. And in light of the ESA errors and the important purposes the statute serves and this presumption of vacator, I'm just going to vacate. But the district court didn't actually look at the individual equities, which it really needed to do here, especially when there's such disruptive consequences that would flow from vacator of the incidental take statement. Okay, let's do this. We'll finish up for now. You'll have a rebuttal. When she comes back, we'll give her three minutes to rebuttal. Thank you. Now if you'll reset the clock, please, for Ms. Wolfe for six minutes. We're getting confused with the clock here. So let's put her down for six minutes. That's what you're getting, right? Yes. All right. All right. Please proceed. Okay, good morning. I'm Laura Wolfe representing the state of Alaska, and the commissioner of the Alaska Department of Fish and Game, Douglas Vincent Ling, is here as well in court. The district court abused its discretion in effectively halting the Chinook troll fishery. This appeal turns on the equities, the equities which will be present, the same equities or very similar equities when Wild Fish Conservancy sues again under the new November 2024. You're talking about the allied approach, right? Yes. I guess the starting point for the equities is the seriousness of the error. We might hope that the service doesn't make as serious an error in its new opinion. Isn't? I guess maybe we should start with that. Right. I mean, these were conceded to be serious errors. They weren't conceded to be serious errors. They were conceded to be errors. Conceded to be errors. That's certain. Okay. And I actually don't think you have to start with that. There are cases from this Court saying even when errors are serious or substantive, we still look at the equities and the equities can control. So I actually would like to start with equities and then turn to the seriousness of the errors and what serious means, not in the abstract, but what this Court, under the allied signal test, has held what serious means. So as for the equities, the District Court abused its discretion in weighing the equities without even defining the equities. The Court made no factual findings about the extent of economic, social, and cultural harms except to say that there would be some economic harms. The Court also made no findings about the benefits to whales except saying, without explanation, I think it would be meaningful, but I don't know how many fish are going to get there, and I don't know what it's going to do. But I think that's meaningful because there are some fish. Can we maybe stipulate that there are serious economic harms on the equities side and talk about the second point, the environmental harms? At what point in time should the District Court have weighed the environmental equities, given that you had, by the time of the remedies order, the hatchery program had gotten off the ground? It's probably not the right thing to talk about with fish, but that was functioning. Did the District Court adequately consider the fact that the prey increase program was successful in its interaction with the incidental take provision? It didn't. It didn't consider it at all. So what we have here is a program where there is a net positive number of increase of fish when you consider the prey increase program, and it's not just the net positive impact of fish. Net positive even given the incidental take? Yes. Okay. So when you look at the Alaska fishery and the prey increase program together, there's a net positive increase in fish. But the two actually aren't the same, right, because the prey increase program is much more diverse in the portfolio of stocks. So instead of if you just had all of the fish, if Alaska forgoes its fish, then most of the prey that is going to go to the killer whales or the killer whales want are Columbia brights. That's the number that we take. Okay. Yeah, I think I appreciate all of that. Given that we have limited time, I want to try to focus you in a little bit more on. So the service's response, and I know you're not the service, but the service's response is that with respect to any deficiencies in the prey increase program, we've got that handled at a site-specific level. But there's not a lot of detail there. Why should the resolution of that or the assurance that that will be resolved factor into the equities? Basically, they're saying we're not going to fix it at a global level because that's not where it should be fixed. It should be fixed at the site level. How does that – where does that factor into the equities? So, first of all, there is a lot of detail. And there might not have been a lot of detail in 2019. But by 2023, actually, there was quite a lot of detail. It's not just a declaration from a federal defendant. It's a declaration plus a ton of exhibits attached saying the who, what, where, when, why, what brood stock the fish are coming from, where, which hatcheries, how many, how much money is going into it, what the overhead was used for when there was overhead. There's a ton of information. It's not just a conclusory statement. By 2023, we know what is going on. And we also have Congress every single year appropriating money for the prey increase program, which is just increasing the hatchery production, the hatcheries that have already had ESA and NEPA analyses done. We're not looking at a blank slate. This is not like, you know, the feds come to this on a blank slate and say, oh, we're just going to create this brand-new program without any environmental analysis. That's not what happened. And so I think that thinking about it like that makes us much more similar to, for instance, the Regan case or NRDC v. EPA, where you're looking at the disruptive consequences. And this is a — this is very temporary, right? In NRDC v. EPA, this Court said we're not going to disrupt, even though there can be — there's going to maybe environmental harm, maybe, we're not going to disrupt for, what, until a new document, like months later, comes out. And here, you know, it's one year or four months later. So I guess why should, then, your claim that the — certainly at the time of the remedy, that the seriousness of the prey increase program error was mitigated, how does that then — you've talked about the overall level of fish, but kind of analytically, how does that inform, then, the incidental take remedy analysis? So you mean NEPA documentation for the ITS? Right. Right. In other words, there were two errors before the district court, that the district court was attempting to remedy and assess with respect to the equities. You've been talking about the success of the prey increase program. How does that crosswalk with respect to any impact on the take? So as far as analysis of the ITS, there's two parts of — for NEPA, which is a procedural statute. There's the public notice, and then there's also the actual analysis. NMTS is at the table at the treaty negotiations. NMTS is one of the players at the intranational treaty negotiations first, before we even go to Canada. They look to see, is this take okay? Is this going to be compatible with the ESA? So that analysis is already — they're already consulting, basically, at that point. So it is — again, this is not where we're operating on a blank slate. I see that I have gone over my time. I'd just like to make one last point, if I can. Quickly, please. So we did — yes, there's economic harms, but this is not just economic harms. There's also huge social and cultural harms, because there are multiple declarations that say, if we can't fish and earn — if half of our income is lost, we'll probably not fish at all. So it forces people into poverty or choosing to leave these very small rural communities, and that's huge cascading effects. It's not just harm to some fishermen. It's remote, isolated communities. Okay. Thank you very much. So, Mr. — you say it's Steading. Is that correct? That's correct, Your Honor. Please. So let's reset the clock for two minutes. Good morning. Douglas Steading on behalf of the Intervenor Defendants of Alaska Trawlers Association. May it please the Court. The trawlers intervened in this matter years ago to protect their way of life. It picks up on where the state of Alaska — Mr. Steading, maybe because you have such little time, you can focus in on this. Sure. What do we do with the fact that we're dealing with a pretty short time horizon now between — for any relief, and as I understand it, we're kind of now between fishing seasons as well. So whatever the harms — the harms on both sides are significantly reduced, perhaps. Which way should that cut? In other words, it's unlikely, if there's not a fishing season going on, that one will be missed between now and November. Should that factor into the analysis? Very good question. I think it gets to the allied signal weighing the consequences of a disruption that may itself be changed. In this instance, it highlights the importance of the need for the fisheries to continue to maintain the way of life. The counsel for the state of Alaska just talked about that, and there's ample evidence in the record on that point from multiple declarants. And yes, the fishing season — it's actually — it's not over. There's another component to it. There is a winter fishing season that is the next highest fishing season in terms of — Let me follow up on my colleague's question. Yes. And I apologize if my factual understanding is incorrect. But it's my understanding that the summer season opens once in July and may or may not reopen still in the summer. Again, I apologize if I have that wrong.  So where are we vis-a-vis the 2024 summer season? Is there going to be a reopening, or are we done? That's to be determined. The numbers from the first part of the opening have not determined whether or not there will be a reopening on the 22nd.  And if there is, it would be August, September? That's correct. And so by the end of September, there won't be any more no matter what, but what you're telling me factually now is there still could be some August-slash-September. That's correct, Your Honor. And I see I'm out of time, so —  Thank you. Thank you. If my colleagues have additional questions. Thank you. Thank you. Thank you very much. All right. So is it Knutson? Knutson. Very good. Mr. Knutson. Good morning. May it please the Court. My name is Brian Knutson. With me at Council table is Emma Bruden, and we're here today on behalf of the plaintiff below, Wildfish Conservancy. Today I intend to focus on the remedy issues, how the district court did not abuse its discretion in issuing the presumptive remedy of vocature for the incidental take statement, and how the court did abuse its discretion in withholding the presumptive remedy of vocature for the pre-increase program. I don't intend to address the additional merits issue that we addressed in our briefs, but if the court has questions, I'm happy to answer them. I do have this question. I assume you acknowledge that the allied signal exception to the vacature exists and is a valid, shall I say, doctrine? That's correct, Your Honor. Okay. I think you would probably also agree that there are lots of small indigenous villages that would be hugely and adversely impacted by the application of the district court's initial order regarding the taking. Do you agree with that? I don't have any reason to dispute it. I don't have any facts to dispute it. But I do want to emphasize that there were important limitations on the court's vocature order. It vacated the take authorization only to the extent it authorized take of southern resident killer whales and Chinook salmon, resulting from the commercial troll fisheries of Chinook. And so it does not apply to noncommercial fisheries. It does not apply to subsistence or treaty fisheries. And it does not apply to recreational fisheries, only commercial fisheries. It does not apply to coho, sockeye, pink, other fisheries. Okay. Yeah. So, well, I suppose it's disputed whether that's a $10 million impact, $29 million. And, of course, by talking in financial terms, we don't intend to derogate at all the critical cultural and community interests here. But you've got some significant economic impact on one side. We talked a little bit about the Lacey Declaration and others. When we're talking about a period even at the time of the remedy of maybe two years and the discussions about the killer whales' fate, those studies are being done to project things over a century. How are we supposed to weigh that? It's not clear in terms of amortizing the harm or benefit to the populations of whales at the issue here that there may be even one whale gained or lost due to this, while we know on the other side there's jobs at stake. What are we supposed to do with that under the Allied Signal analysis? Sure, Your Honor. Thank you. So I think the starting point is the statute. As the Court identified earlier, the statute directs that the Court shall set aside unlawful agency action. So that's the presumptive remedy. If the Court wants to deviate from the presumptive statutory remedy under Allied Signal, it certainly can consider the equities. This Court has consistently held, looking to Section 7 of the Endangered Species Act, that the Endangered Species Act is different, that when it comes to protecting threatened and endangered species, Congress has determined that the equities weigh in favor of protecting the species over economic interests. And so I think consistent with this Court's principle. But isn't that double-counting one of the factors in Allied Signal? All right. We've got the — once we're at Allied Signal, we're looking at the seriousness of the legal error, i.e., whether it violated the Endangered Species Act or NEPA. Then the disruption is a separate inquiry. If we include, as it seems like the district court might have done, the values inherent in avoiding the legal error in the equities of the disruption, are we not improperly double-counting the first step of it? I'm not sure what you mean by double-counting, Your Honor. I look at the — Well, we're supposed to consider the legal error in the first one. And you say, well, the ESA says that the legal error under the ESA is really, really bad and disruptive. I see. But then that's bringing it into the second step of the equities analysis, which doesn't seem to be what Allied Signal is about. Well, I understand that that's not what Allied Signal is about. The legal principle that I'm referring to, you know, it stems from the Supreme Court's interpretation of Section 7 of the Endangered Species Act in the TVA v. Hill case, where the Supreme Court determined that when evaluating remedies under the Endangered Species Act, courts — Congress has struck the priorities, the equities in favor of protecting threatened and endangered species through a principle of institutionalized caution. That principle should apply equally when considering vocature under the Administrative Procedure Act. Okay. And at which step? At the first step in terms of the seriousness of the error or the second step in terms of the level of disruption? Well, I think it goes to the — how the Court weighs the economic consequences, the amount of weight that the Court gives to the disruptive economic consequences of the vocature. You know, I feel like I've been through this record before. When I first came on the Court, it was the spotted owl, the northern spotted owl. And everything was in uproar, and a whole bunch of towns and schools in Oregon and Washington and Idaho were absolutely devastated. Well, it turns out it was the horned owl that was killing them, and now the Service is going to kill all the horned owls to save what's left of the spotted owl. It's the typical problem that courts — we deal with sledgehammers, not scaffolds. And what I wrestle with in this case, I totally get it that the ESA is a very, very, very important statute and that preserving killer whales is a very important aspect of that. But when we talk about weighing reports that don't agree, as I pointed out by my colleague, you've got an expert that says one thing, the world is going to end. You've got the other side that says, no, no, it's totally wrong. And the district court is kind of balancing it. We have to look at what the district court says. But we have all these fallouts. And I guess my question to you for the Conservancy is, doesn't the allied signal exception not only encourage but almost require us, particularly when we're dealing with some of these endangered indigenous communities, to really keep the equities in mind? Now, obviously, the whales are super, super important. But the government says they're fine. They're doing well. You say not so much. But don't we have to proceed with great caution in this? Because this is not a science. It's an art. Do you agree with that? I do, Your Honor. I will say, under this Court's precedent applying the allied signal factors, the Court, given the statutory mandate, the starting point of the statute that the Court shall set aside unlawful agency action, this Court has found remand without vocature appropriate in limited circumstances. Generally speaking, only when the errors were relatively minor or technical in nature and the consequences of vocature substantially outweighed what were otherwise minor technical errors or where vocature itself would result in more environmental harm than leaving the agency action in place. And that's not the case here. Here you have extensive substantial violations of both Section 7 of the Endangered Species Act and a wholesale violation of the National Environmental Policy Act. And I'm unaware of any case where this Court has left in place an agency action that was adopted with such extensive violations of Section 7 and a complete failure to do NEPA. Mr. Knutson, with respect to the prey increase program, that was underway and at least more successful than could have been anticipated under the analyses that were at issue at the liability phase. And so the district court considered that. I understand you disagree with the district court's consideration of that. Shouldn't the district court have factored that into the incidental take portion, too? In other words, my sense, I think both parties believe that there is an integrated relationship between both of these programs. And, you know, you're both saying, well, you can't just consider one. The district court only considered one. It didn't consider the success of the prey increase program on the take side of it. Was that error? Well, so I agree that the district court did not discuss the implementation of the prey increase program in the vocature section of its remedy order. There remains to be no plan, no analysis showing how the prey increase program will actually benefit southern resident killer whales. And so we have — that was one of the original errors, that the district court initially found that there was no definite plan showing that this Federal funding program that was going to fund increased hatchery programs would actually result in any net benefit to southern residents because increasing hatchery production reduces the productivity of wild populations. But that was an analysis done back in 2022. By 2023, there's more information. And then aren't we allowed to consider the likelihood that even if the error is serious, the agency can cure it, particularly when we've got a 2024 timeline to do so? Yeah, so the point I was trying to make is that deficiency remains, that serious violation remains. There is no plan showing how this prey increase program will benefit southern residents. Instead, what the agency has been doing is funneling money into hatchery programs that it thinks already have ESA or NEPA coverage and increasing hatchery production at those hatchery programs without any sort of demonstration on how that's going to actually produce more prey for southern residents. And so there remains to be no plan showing how there's going to be a net benefit. So are you saying then that even with the 2024, the November revised opinion coming out, that is not set up to cure the errors with respect to, I mean, you haven't seen it yet, but that's not even designed to cure these earlier errors with respect to the prey increase program? You know, we don't have the answer to that. We haven't seen that. What we have not seen yet is any sort of analysis showing how the prey increase program will benefit. Do you agree that there are more fish under the analysis now with both together than there would be without? I would not necessarily agree that there is more fish in the river because, again, increased hatchery, just dumping more hatchery fish into a water body does not necessarily produce more adults returning to marine waters where the southern residents are present. So, Kinsel, let me ask you a related, somewhat related question, which is troubling to me as an obvious non-expert. So I'm going through, for example, Dr. Lacey's third declaration. I'm looking at paragraph 8. And he has some statistical analysis and talks about we can estimate there's about a 6% reduction in prey available caused by the fishery as a whole. And then he says, understandably, but with considerable uncertainty around this number. And this is something about this whole case that is troubling to me as a non-expert deciding. There is a lot of uncertainty around everything here in terms of is it going to help the whales? Is it going to hurt the whales? And all we know for sure, I think, is that closing some of the fisheries is absolutely going to cause harm to inhabitants of Alaska and their various subsistence and cultural practices. How do we as judges, in your view, factor in the known harm with the enormous uncertainty for both aspects of what we're dealing with here on a, in relative terms, a very small population that we're looking at? Which, again, it's small so it is in more danger of extinction, but it's small so looking at how something with regard to Chinook is going to affect that 74 population or whatever the number is now, I find it very difficult to come out on your side, given the uncertainty about the numbers, but convince me why I should be less troubled. Okay, Judge Bennett. First of all, with respect to the economic harm, we certainly, as the district court did, recognize that there will be meaningful economic impacts. I also think there's a significant amount of speculation with respect to the economic impacts. Their position is that if they're unable to harvest Chinook, well, maybe nobody will fish anything, but a large, half and even sometimes over half of the economic value of the troll fishery is from Coho, and so a significant portion of the troll fisheries at issue are unaffected by the remedy order, and it's largely speculation as to the extent of the economic impact. With respect to the environmental harm, I looked to Dr. Giles' declaration. She's a marine biologist that focuses strictly on the southern resident killer whales, and her testimony is the condition is really bad and it's getting worse, that these whales are continuing to die, and it's gotten worse during the stay. There's been no live births since and including 2023. I'm sorry, there's one, but the whale died within a month, and there's been multiple late-stage pregnancies that did not produce calves. So the condition is getting worse, and as Dr. Giles explained, these whales need prey now. Mr. Knutson, I guess that points out the change status quo. I mean, we've now got a stay in place here, and we've got a four-month run between now and when there will be a new opinion that may raise other issues and may bring new challenges but may moot the current action. What's your view on our best approach? I'm sure everyone would like to win today. I'll tell you that's probably not going to happen in terms of the timeline. So how are we to deal with the fact that we've got a stay in place and we've got mootness on the horizon in November? What would you have us do?  So I think we'll come out of this argument requesting that the court promptly lift the stay issued by the motions panel as a beginning request. But I'll also emphasize that we do not share the confidence that the government has that new decisions will be out in November. We've experienced long delays in NOAA's ability to get ESA and NEPA documents for both fisheries, and particularly with hatcheries. We've seen 10, 15-year delays in their ability to approve hatchery programs under the Endangered Species Act and NEPA. And there's been numerous other events in the last 12 to 18 months that lead us to believe that there might be substantial delay in those approvals. And so, again, focusing on the institutionalized caution, we think if there may be delays that the benefit of the doubt should be given to the species and not to the hopes that NOAA, the gambling, that NOAA will get legal and new documents out. I hope it's not viewed as gambling, but are you, so from your perspective, you're willing to take the chance on getting an answer from us sooner rather than later as opposed to holding the services' feet to the fire to get a new opinion out? Certainly with respect to, I think that our preference would be to provide prey as soon as possible for the southern resident killer whale. Well, that's assuming you know the results of it, but you would rather get an opinion now or a decision now before the opinion rather than continuing to monitor the situation. So let me step back. So in the Reagan case, the Center for Food Safety v. Reagan case, there was a failure to consult in that case, and the agency remanded without vocature but mandated that EPA complete consultation within the statutory deadline of 180 days. Here, in contrast to that with the more recent Migrant Clinicians Network case where EPA said it could not complete consultation within the 180 days, but it still requested remand without vocature, and this court said, we're not going to issue a blank check remand without vocature and allow you to delay consultation indefinitely. And so our position is that it is an abuse of discretion to allow the agency to continue implementing the action without any deadline. So our preference would be a deadline. Our preference would have been 180 days from the merits ruling where the agency knew it had a duty to consult. If we could rely entirely on Dr. Lacy and the other experts, and they could speak with absolute certainty, I would be more persuaded by what you're saying. But as my colleague pointed out, Dr. Lacy basically said, this is my best guess. That's what it is. Maybe not all the experts that way. I don't know how somebody can absolutely tell how many calves are born. They must be really busy people. But I don't know whether that's a guess as well. What I'm struggling with is, is this hard science or this is the best we can do? And do we basically pull down the pillars of Hercules in the hopes that the building can somehow be saved thereafter if it turned out there was not a problem? Judge Smith, I'm glad you brought me back to this issue. So there are multiple data points that the Court looked at, and the district court did look at multiple data points when evaluating this issue. I think that maybe the best data point is what happened before the lawsuit. And before the lawsuit, NOAA issued a biological opinion. And NOAA's incidental take statement found that these fisheries are likely to result in harm constituting take of southern resident killer whales. It found that these fisheries are likely to or may increase the risk of poor body condition and nutritional stress. So the NOAA found that these fisheries are going to cause take. Before they were sued, they've sort of — I'll say that again. I'm sorry. The fisheries were what, did you say? So this is at 6ER-1206. NOAA, in the challenge biological opinion, found that these fisheries are likely to result in some level of harm constituting take of southern resident killer whales. That's the agency's official position. Not its post hoc litigation position, its official position. So I guess to come back to the time that's passed since the equities were last evaluated, you're still asking us to vacate the prey increase program where things had changed that were unaccounted for even at the point of the remedial decision. Things have changed more with respect to the — now with the stay. How are we supposed to decide what to do and decide the equities now when I think everyone concedes that the increase program, whether good or bad, is well underway? How would we know from where we stand now what the equities say as to that program in relation to the incidental take program when we're two years down the road? Well, first, I think it's important to emphasize the serious violations underlying the adoption of the prey increase program. Sure. Yes. This is an enormous federal funding program adopted without any NEPA and without a consulting on whether it's going to jeopardize, threaten Chinook salmon. But that's going to be — but the service is attempting to cure that by November. You agree. They're at least attempting. Yeah. Again, I would take issue of whether or not the agency is curing it because the agency is committed through this ongoing process to adopt that program. And NEPA requires the agency to meaningfully consider alternatives. And here, the agency has issued incidental take statements legally reliant on this prey increase program. And so, you know, I question whether a new NEPA analysis is actually going to remedy this violation. Okay. I'd also take issue with the — with the success of this program. And so this is another significant error that the district court made in declining to vacate this program. The district court found that in 2022, the program released 19 million smolts, which is pretty close to the 20 million target. It's undisputed that the actual number of fish released from the prey increase program was 8 million that year, and that the difference of 11 million was released under an entirely different program implemented by the State of Washington that's either going to continue or not continue, irrespective of what the district court did below or what this court does here with the prey increase program. Okay. Thank you very much for your argument. Thank you, Your Honor. I appreciate it. So, Ms. Hanson-Young, you have three minutes for rebuttal. It is undisputed that whales are not going to go extinct in the next four months. Nobody has made that argument. On the other side, the short timeframe remaining would — if the stay were to be lifted, that would irreparably harm southeast Alaskan communities because there would be many communities and individuals are unable to pivot to other jobs. People have to plan several months in advance before they can go out and fish. So it would throw that whole community into considerable uncertainty. So you asked a question earlier about, well, how does the short timeframe affect it when it minimizes the harms on both sides. No, only on the killer whale side of the equities. How do we have any assurance that it's four months? The government can commit that it will issue the biological — you know, barring unforeseen circumstances, the government will issue — Well, that's kind of what this whole case is about, isn't it? True, true. But then we — that's certainly true. I mean, if there were some — I can't even imagine what would happen that would derail it. But by all accounts, the government is on track to issue this by the end of November. And, I mean, you've asked about, well, what do we make about the short timeframe? I mean, it is difficult because it could arguably be a waste of the panel's time to write a decision that will become moot by the agency's own issue. So, counsel, the government would, for example, have no objection if, say, we were going to rule before then, and at least in some aspects rule in the government's favor, but the case would be continuing because there wouldn't be mootness at that point to say in our order. But if the government doesn't do it on time, we instruct the district court to grant relief to plaintiffs? I wouldn't agree to such a broad grant relief to plaintiffs. I think, you know, reinstatement of the vacator, partial vacator, or something like that. The government is not concerned that it will not meet the end of November deadline. So the government would not have an objection if we were going to hypothetically rule, as I've said, to put in there an instruction to the district court as to what to do, to do some things in plaintiffs' favor, if the government doesn't meet the timetable that you say that, barring some unforeseen catastrophe, the government's going to meet? Correct. That's correct. And courts frequently do that when deciding not to vacate government action. They say, we know that there can be a lot of delays, and we want to make sure there won't be delays, so we are going to delay vacator until X date. And the district court didn't do that here. That would have been a more narrow version of vacator, of remedy, that it could have done but didn't do. We would not object so long as any instruction to the district court would be post-December 1. Again, I don't think that's necessary because we have committed to completing the documents by then, but if that would give the court some assurances. Your time is up. Let me ask, do either of my colleagues have additional questions? I know we could talk about this forever. Certainly. We appreciate counsel's argument. The case just argued is submitted, and I just want to add for the record that my law clerk, who's in the audience, has informed me that killer whales are dolphins. So there you go. The case just argued is submitted, and the court stands adjourned for the day. All rise.
judges: SMITH, BENNETT, JOHNSTONE